In re 433 SOUTH BEVERLY DRIVE, a California limited partnership, Debtor.

**Bankruptcy No. LA 88–17959 KL.**

United States Bankruptcy Court, C.D. California.

July 3, 1990.

Edythe L. Bronston, Los Angeles, Cal., for Provident Nat. Assur. Co.

H. James Rosenberg, Los Angeles, Cal., for Marathon Nat. Bank.

Victor Sahn, Los Angeles, Cal., for debtor.

MEMORANDUM OF DECISION ON MOTION BY DEBTOR TO SELL FREE AND CLEAR OF PREPAYMENT PREMIUM AND DEFAULT INTEREST

KATHLEEN T. LAX, Bankruptcy Judge.

## PROCEDURAL HISTORY

433 South Beverly Drive, a California limited partnership, is the debtor and debtor in possession pursuant to a voluntary petition under Chapter 11 of the Bankruptcy Code filed on August 24, 1988 ("Debtor").[1] The Debtor's sole asset is an interest in a lease for real property and an approximately 10,000 square foot office building located thereon at 433 South Beverly Drive, Beverly Hills, California (the "Lease Property"). Pursuant to a stipulation between the lessor and the Debtor, the Debtor assumed the lease.

The Debtor filed a motion seeking to sell the Lease Property, free and clear of liens, for $3,450,000. It is undisputed that the amount of the proposed purchase price is well in excess of the aggregate value of all liens on the Lease Property, including amounts sufficient to pay claims, which the Debtor seeks to invalidate, for default interest, a prepayment premium and attorneys' fees.

The court granted the motion to sell pursuant to 11 U.S.C. § 363(b)(1) and (f) and authorized the Debtor to pay all undisputed claims or portions thereof on close of escrow. The issues of the enforceability of the claims for default interest, a prepayment premium and attorneys' fees were taken under submission. The Debtor was required to set aside from the sale proceeds, in an interest bearing, segregated account, an amount sufficient to pay these disputed amounts pending resolution of their enforceability.

## THE DISPUTED CLAIMS

I. *Allowability of Claims for Interest at a Higher Rate on Default*

A. Facts

Provident National Assurance Company ("Provident") is the holder of a first trust deed to secure payment of a loan obligation from the Debtor (the "Provident Obligation"). The Provident Obligation provides for interest at a non-default rate of 11.75% per annum. After default, the ap-

---

1. Subsequent to hearing on this matter, after notice and a hearing, a Chapter 11 trustee was appointed in this case.

plicable interest rate pursuant to the loan documents is 18% per annum.

Marathon National Bank ("Marathon") is the holder of a second trust deed on the Lease Property to secure payment of a loan obligation with interest at the non-default rate of 2.0% in excess of the Bank of America reference rate (the "Marathon Obligation"). The Marathon Obligation also provides for interest on default at a higher rate of 5% over the non-default rate.

The Debtor seeks to invalidate and sell the Lease Property free and clear of the liens arising from that portion of the claims of Provident and Marathon which reflect the higher rate of interest claimed as a result of the Debtor's acknowledged default in payments under each loan. The Debtor argues that payoff on sale of the Lease Property of the loan principal, interest at the non-default rate and reasonable costs incurred by the lenders in connection with any foreclosure proceeding constitutes a cure of all defaults. The Debtor further argues pursuant to the decision of the Ninth Circuit in *In re Entz–White Lumber & Supply Company, Inc. ("Entz–White")*, 850 F.2d 1338 (9th Cir.1988), that such cure entitles the Debtor to avoid all consequences of its default, including the accrual of interest at the default rate.

## B. Discussion

■ The ability of an oversecured creditor to recover interest at a higher rate as a consequence of a debtor's default is addressed by the Ninth Circuit in two cases of fairly recent origin: *Entz–White* and *In re Southeast Co. ("Southeast")*, 868 F.2d 335 (9th Cir.1989). In both, the Ninth Circuit disallowed such interest.

Differences in the underlying facts and posture of the instant case raise the question of whether *Entz–White* and *Southeast* control the outcome and compel this court to disallow default interest to Provident and Marathon.

**2.** 11 U.S.C. § 1124(2).

### 1. *Maturity of the Underlying Obligation vs. Deceleration*

■ But for any acceleration on default, the Provident Obligation matures under the terms of the contract on a date in the future. The Marathon Obligation matured and became fully due and payable without reference to acceleration prior to the commencement of the case. This court concludes that *Entz–White* and *Southeast* nullify any distinction in the treatment of these disputed claims based on whether, at the time of payoff or "cure," the underlying obligation is capable of deceleration or has fully matured.

In *Entz–White*, the debt had matured prior to the commencement of the bankruptcy case and, therefore, was fully due and payable at the time the debtor sought to pay the claim under its plan of reorganization. As in this case, the debtor in *Entz–White* argued that the payment of arrearages, namely all principal and interest at the non-default rate, constituted "cure" under its plan and that "cure" entitled the debtor to avoid *all* consequences of default, including any enhanced interest factor. The Ninth Circuit agreed, flatly rejecting the creditor's argument that "cure" only applies when the debt has been accelerated and the opportunity still exists, on deceleration, for the parties to return to their pre-default terms, including interest at the non-default rate.

The creditor in *Southeast* fared no better where, instead of payoff and extinguishment of a mature obligation, the debtor decelerated the debt under its plan of reorganization and reinstated the original maturity date which had not yet passed. The Ninth Circuit reiterated its position announced in *Entz–White* that "[s]ection 1124(2) of the Bankruptcy Code 'authorizes a plan to *nullify all consequences* of default, including avoidance of default penalties such as higher interest.'" [2] *Southeast* at 338, quoting from *Entz–White* at 1342.

Therefore, the difference in the maturity of the Debtor's respective loan obligations to Marathon and Provident does not require any distinction in the treatment of their claims for default interest.

### 2. Cure Pursuant to a Plan vs. Payment on Sale Under Section 363.[3]

■ In both *Entz–White* and *Southeast*, the question of the allowability of default interest arose in the context of treatment of the creditor's claim pursuant to a plan of reorganization.[4] Here, the Debtor sought authority to sell out of the ordinary course of business under section 363, with all undisputed amounts (i.e., principal and interest at the pre-default rate) to be paid on close of escrow. Should a demand for post-default interest be treated any differently when made in the context of a plan as opposed to a sale under section 363? This court concludes that it should not.

Both *Entz–White* and *Southeast* depend heavily on the concept of "cure" and the conclusion that "cure" allows a debtor to avoid all consequences of default, including an enhanced interest factor. The ability to cure defaults is an integral component of a debtor's powers under a plan. Section 1123(a) mandates that the plan provide "adequate means" for its implementation and specifically enumerates "cure or waiving of any default" as one of the means.[5] Section 1124, which addresses the impairment of claims or interests, is also applicable only in the plan context and allows, inter alia, the debtor to cure both pre and post petition defaults and reinstate the pre-default maturity so long as the debtor also compensates for damages and does not otherwise alter the creditor's rights under non-bankruptcy law.[6]

"Cure," either as a right or an obligation, is not specifically addressed in section 363. However, one cannot, by its absence from the text of section 363, leap to the conclusion that "cure" and any legal considerations based on the concept of cure have no application to the sale and consequent payment of obligations under section 363.

The concept of "cure" is not exclusive to Chapter 11 or plans of reorganization. Cure is also an issue of consequence when a debtor seeks to assume an unexpired lease or executory contract under section 365.[7] Both references to cure involve a determination of the amount of a creditor's claim which is allowable and ultimately payable in a bankruptcy proceeding, provided that assets prove to be sufficient. That is the same issue presented in the instant case. Absent some compelling reason to

---

3. Unless otherwise stated, all statutory citations herein refer to title 11 of the United States Code.

4. *Entz–White* provided for payment in full of the allowed secured claim and *Southeast* involved cure of the arrearages, deceleration, and future payments according to the pre-default contract terms.

5. Section 1123(a): "Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall—

(5) provide adequate means for the plan's implementation, such as—

(G) curing or waiving of any default; ..."

6. Section 1124: "Impairment of claims or interests.

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest .entitles the holder of such claim or interest; ..."

7. Section 365: "Executory contracts and unexpired leases.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default; ..."

the contrary, the construction of "cure" and its application to the allowed amount of a creditor's claim should not differ depending on whether it arises under a plan or in some other context in the Bankruptcy Code.

Likewise, even if one concludes that "cure" is not the appropriate focus in analyzing payments to be made on a section 363 sale, the result should not be substantially different. The amount due to a particular creditor is a question of allowability, regardless of the statutory context in which it arises. Absent compelling circumstances, the allowed amount of a creditor's claim should be substantially the same whether the creditor is paid in full on the effective date of a plan or on the close of escrow on sale pursuant to section 365.

Based on the foregoing, this court concludes that the claims of Provident and Marathon for interest at the post-default rate of interest must be disallowed in conformity with the analysis of the Ninth Circuit in *Entz–White* and *Southeast.*

### C. The Proper Measure of Post–Default Interest

█ Although the Ninth Circuit refused to enforce contractual provisions for compensation on account of default in *Entz–White* and *Southeast,* these cases do allow post-default compensation. In examining the question of what the appropriate measure of post-default compensation should be, both *Entz–White* and *Southeast* analyze section 1124 and section 506(b), as well as their interrelationship.

Under section 1124(2), a creditor is impaired in its treatment under a plan unless the debtor, in addition to cure and reinstatement, compensates the creditor "for any damages incurred as a result of any reasonable reliance" on the "contractual provision" for post-default interest.[8] In the absence of a plan, as is the case herein, impairment is not specifically an issue. However, to the extent section 1124(2) elucidates the concepts of cure and allowability of claims, it is instructive in this case. In *Southeast,* the Ninth Circuit quoted and

8. See Footnote 6 for the text of section 1124(2).

expressly readopted its approval in *Entz–White* of the Bankruptcy Appellate Panel's holding in *In re Southeast Co.,* 81 B.R. 587, 592 (BAP 9th Cir.1987): "reliance damage under section 1124(2)(C) 'does not comprise contractual penalty interest rates.'"

Under section 506(b), an oversecured creditor is allowed to recover "interest on [its] claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose." Allowance under section 506(b) is directly relevant to the analysis of the Provident and Marathon claims. However, in *Entz–White* and *Southeast,* the Ninth Circuit also expressly rejected section 506(b) as a basis for the recovery of an enhanced rate of interest after default. Instead, the court found that:

> "[t]he more natural reading of sections 506 and 1124 is that the interest awarded should be at the market rate or at the pre-default rate provided for in the contract."

*Southeast* at 338, quoting from *Entz–White* at 1343.

Neither *Entz–White* nor *Southeast* provide guidance on when the appropriate rate should be calculated at the market rate and when it should be set at the pre-default rate. However, the Ninth Circuit expressly recognized and endorsed "bankruptcy courts' 'broad equitable discretion' in awarding post-petition interest. *See In re Anderson,* 833 F.2d 834, 836 (9th Cir. 1987)." *Entz–White* n. 9 at 1343. In the interest of balancing the preservation of contract rights with the need to compensate for actual damages incurred, this court concludes that the proper measure of post-default interest is the *higher* of the market rate during the default period and the pre-default contract rate.

### II. *Prepayment Premium*

#### A. Facts

The Provident Obligation provides for a "Prepayment Premium" which becomes due if the loan is paid off prior to the

original maturity date. The amount of the Prepayment Premium is calculated pursuant to a formula set forth in the promissory note and is expressly due "in the event of acceleration of the Note at any time and subsequent involuntary or voluntary prepayment." The Debtor seeks to invalidate and sell free and clear of this charge on the grounds that prepayment premiums or "penalties" are unenforceable both under applicable state law and under the Bankruptcy Code.

### B. Discussion

#### 1. *Enforceability under Non-bankruptcy Law*

■ If the Prepayment Premium is not valid and enforceable by Provident outside of the bankruptcy context, it does not become valid and enforceable merely as a consequence of being asserted in the context of a bankruptcy case. Therefore, this court must examine Provident's rights under applicable non-bankruptcy law.

The Debtor is a California limited partnership and Provident is a Tennessee corporation. Since Provident is not a federally-chartered lender, no issue of federal preemption arises except out of the application of bankruptcy law.

■ Pursuant to a choice of law provision in the Provident Note, the Debtor and Provident agreed to construction of the Note under California law. Based on the law of California articulated in *Golden State Properties v. Columbia Savings and Loan Association* ("*Golden State*"), 202 Cal.App.3d 193, 248 Cal.Rptr. 316 (1988) and *Pacific Trust Co. TTEEE v. Fidelity Fed. Sav. & Loan Assn.* ("*Pacific Trust*"), 184 Cal.App.3d 817, 229 Cal.Rptr. 269 (1986), this court concludes that the provision for a Prepayment Premium in the Provident Note is enforceable under California law.

At issue in *Golden State* was whether the borrower's obligation for a prepayment premium could be asserted against a junior lienholder purchasing at the trustee's sale. The Court said yes. The California Court of Appeals held that a junior lienholder had the same obligation to pay a senior lienor's prepayment charge on purchase of the property at a trustee's foreclosure sale as the junior would have had if it had exercised its statutory right of redemption. As here, the prepayment clause in the *Golden State* case provided for a prepayment charge on early payoff "whether such payment is voluntary or involuntary," even if such payoff is a result of acceleration of the debt on the borrower's default. *Golden State* 248 Cal.Rptr. at p. 318.

In *Pacific Trust,* a prepayment charge was held to be enforceable against a junior lienholder who exercised his statutory right to pay off the senior debt on the borrower's default. Implicit in both *Pacific Trust* and *Golden State* is an affirmation that such a prepayment charge is enforceable against the borrower under California law. No contrary authority has been brought to the attention of the court by the Debtor.

The Debtor's contention that the Prepayment Premium is invalid because the sale is "involuntary" is disingenuous. First, the fact that Marathon accelerated its junior note one day prior to the commencement of the bankruptcy case does not make any subsequent sale "involuntary." Second, the Debtor gives no reason or explanation in support of its related contention that "given the fact that the note was accelerated under state law, Debtor does not believe that under Section 1124(2) that it would be in a position to decelerate the debt to Marathon under a plan of reorganization." (Debtor's Reply, p. 13). Third, the proposed sale was solicited by the Debtor, on the Debtor's terms and it is the Debtor which sought and received authority to complete the transaction. Finally, in *Golden State* the Prepayment Premium was validated even in the context of an "involuntary" trustee's or foreclosure sale.

#### 2. *Enforceability under Bankruptcy Law*

■ Nothing in title 11 automatically invalidates a provision for a Prepayment Premium which is otherwise enforceable under applicable non-bankruptcy law. In *In re Imperial Coronado Partners, Ltd.* ("*Imperial Coronado*"), 96 B.R. 997 (9th Cir.B.

A.P.1989), the Bankruptcy Appellate Panel upheld the enforceability of a prepayment premium. The Panel further held that prepayment of a loan by a borrower following acceleration of the debt on default did not make the debtor/borrower's request for approval to sell the underlying property an "involuntary" payoff of the debt.

■ For purposes of determining whether the prepayment premium clause is enforceable, there is no significant difference between the facts of this case and those present in *Imperial Coronado*. The Panel rejected the argument that when the debtor cannot afford to pay arrearages and reinstate the loan, a prepayment charge is an "unfair and inequitable ... punish[ment]" of the Debtor for selling the property under section 363. Instead, the Panel stated that "[w]ith respect to reinstatement, the question is not whether ICP could, as a practical matter, afford to exercise its right, but whether it had the right to reinstate the loan." *Imperial Coronado* at 1000. The Debtor has not offered any showing of an inability to reinstate the loan under either California law or to decelerate the loan under bankruptcy law. Therefore, the court concludes that there is no per se invalidity of the provision for the Prepayment Premium in this case.

### 3. *Allowability under 11 U.S.C. § 506(b)*

■ Bankruptcy Code section 506(b) provides that to the extent that an allowed claim is oversecured, "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." Here it is undisputed that Provident's allowed claim is oversecured and that the Prepayment Premium is a charge provided for under the loan agreement. Under section 506(b), the Prepayment Premium is subject to the limitation of "reasonableness." *Imperial Coronado* at 1000. "Reasonableness" is an analysis that is governed by federal law. *In re 268 Ltd.*, 789 F.2d 674, 676–77 (9th Cir.1986).

Provident urges the court to adopt the analysis of *In re Schaumberg Hotel Owner Ltd. Partnership*, 97 B.R. 943 (Bkrtcy. N.D.Ill.1989) which concludes that a charge should be allowed if it was a reasonable estimate of damages at the time of the making of the contract. *Imperial Coronado* reaches a different conclusion, stating:

[A] lender is entitled, under section 506(b), to collect only the difference between (1) the market rate of interest on the prepayment date, and (2) the contract rate, for the remaining term of the loan.

This court is bound by the rule set forth in *Imperial Coronado*.

Therefore, Provident is entitled to an allowed claim calculated in conformance with the formula set forth in *Imperial Coronado*. The precise amount cannot be determined without further evidence relating to the actual date of close of sale and the prevailing market rate of interest when the funds became available for payoff. A date for hearing on the amount of Provident's allowed claim for a prepayment premium will be set on request of the parties.

### III. *Attorneys' Fees*

As of June 1989, Provident and Marathon, in the aggregate, claimed attorneys' fees and costs in excess of $58,000 pursuant to clauses in each of their loan documents. The Debtor admits that each creditor is entitled to "reasonable" fees but objects to the amount of such fees on the grounds that the actions of these creditors were excessive and unwarranted given the large equity cushion available to each of them and the lack of any cash collateral to protect.

Marathon and Provident assert, in response, that the Debtor's continuing misconduct made investigation and vigilance necessary. They further assert defending against court proceedings initiated by the Debtor was necessary to protect their respective interests.

Based on review of the contractual provisions for recovery of fees and costs, the pleadings and proceedings in this case, declarations of counsel and supporting docu-

mentation provided to the court, the following amounts are allowable:

A. Marathon, for the period to and including June 13, 1989: fees in the amount of $16,900 and costs in the amount of $427.42, for a total of $17,327.42. This allowance reflects deductions where the description of the work done was totally inadequate to assess reasonableness and where the time expended seemed excessive for the tasks described.

B. Provident, for the period to and including May 31, 1989: fees in the amount of $31,000 and costs in the amount of $2,969.47, for a total of $33,969.47. No allowance has been made for time estimates. Compensation for actual time expended may be sought by subsequent application. Deduction has also been made where descriptions did not justify necessity for time charged. Specifically, in several cases, it is not clear that conferencing between various members of the law firm had any compensable purpose or produced any result or work product related to protecting Provident's interest in its collateral.

In addition, duplication expenses listed for May 31, 1989 appear to be excessive. Even at $.25 a page, the amount charged would yield 3176 pages. Absent further explanation and justification, no amount will be allowed for duplicating expenses for May 31, 1989.

## CONCLUSION

A separate order consistent with the foregoing will be entered concurrently herewith.